The $6.6 million in punitive damages awarded in this case cannot stand because Mr. Marlo failed to present legally sufficient evidence that a managing agent of UPS made the termination decision. Counsel, when I read White v. Ultramar, my conclusion was I can't figure out what California law is on a managing agent. It looks like a jury question rather than a legal question because they seem to go back and forth in somewhat unpredictable ways on whether you really have to be a policymaker for the corporation or if you're high enough up, you're treated like one. Why isn't it enough that the jury had a proper instruction and decided that he was? Let me start with the first part of your question, Judge Kleinfeld. The White case clearly articulates the standard, which is the managing agent must, quote, exercise substantial discretionary authority in their decision making so that their decisions ultimately determine corporate policy.  Then the question is, is there legally sufficient evidence in this case from which the jury could have concluded that Mr. Robinson exercised such authority? And the answer is no. And to pick up on one of your points about whether that is a clear test, the California Supreme Court returned to it in the Roby v. McKesson case and said, what kind of policies are at issue? And the court said, quote, formal policies that affect a substantial portion of the company and are of a type likely to come to the attention of corporate leadership. So those are the California Supreme Court's legal standards. And on this record, there is no evidence that Mr. Robinson had any role in UPS corporate policy. The other point from the White case. I thought based on that convenience store case, they could say that they could have a written policy that says you don't discipline people for challenging a corporate policy, but a practical policy by a guy high enough up to enforce it, that we don't follow that written policy. If you challenge the company's overtime policy or whatever it was, you're going to get canned. Your Honor, there is a line of authority that says that a manager's authority to depart from corporate policy absent supervision from above is sufficient to establish that he has authority to set policy. There's no evidence of that here either. There's no evidence that Mr. Robinson departed from corporate policy. In other words, all that was submitted to the court here and to the jury here was Robinson's title, the number of authorities under his supervision, and the size of his district. And the district court here, we know, made a very clear legal error in deciding this question. The district court said twice, and it's on page ER 19 and ER 22, Robinson was a managing agent because he made the termination decision. If we go back to White, Your Honor, that was the issue in the case. The California Courts of Appeal had conflicted on that very point in wrongful termination cases, and the Supreme Court very strongly said that merely the authority to terminate can't make you a managing agent. Otherwise, punitive damages would be available in every wrongful term case. And then the court, and this is a very important point of White that has been overlooked, I believe, by my colleagues, it said let's look at the statute. It says officers, directors, and managing agents, and that those three things have something in common. The legislature used them to define the control group of the corporation. Well, my question, actually, questions, are exactly the same, but I'll state it slightly differently because I'm not sure I understand what your answer is as Judge Kleinfeld's questions. When I read White v. Ultimar, and it says here the managing agent must be someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy. I have no idea what that means. It's one of those situations where the devil's really in the details, and you look at the cases in California that have applied that concept, either formulation of actual policy or ad hoc formulations of policy, and then you try to figure out what that phrase really means. And in looking at the facts of White, I don't see how the manager in this case, Ms. Robinson, is different than Ms. Lorraine Salas in the White case. So that's application. Let's set aside all of the definitional terms here. She was a local supervisor who apparently lacked the authority to terminate that plaintiff without having to go to human resources manager and division manager, but yet she exercised authority that necessarily resulted in the ad hoc formulation of policy that adversely affected the plaintiff. And I'm looking at the case, I think this might be Judge Justice Moss's concurrence, but as he described it, she, meaning Ms. Salas in the White case, engaged in local practice of retaliating against by firing an employee who testified at the unemployment hearing of another employee. And so here, Mr. Robinson took retaliatory action against somebody who was utilizing the court process in order to vindicate rights. How is that not factually similar to White, such that Mr. Robinson, like Ms. Salas in White, could also be deemed a managing agent? Judge Winn, thank you, and let me try to explain that point. As to the termination decision, White could not be more clear, and this is the majority opinion at page 575, that the mere fact that the supervisor had the authority and exercised the authority to hire or fire an employee does not make that person a managing agent. At the end of the opinion, at the end of the majority opinion, part D, was Salas a managing agent, what the court held was there was sufficient evidence aside from the termination decision to find that Salas was a managing agent because the supervision of eight retail stores and 65 employees is a significant part of Ultramar's business, and the testimony of the other managers, including Salas' supervisors, established that she had substantial discretionary authority over that company's, that small company's, business because of the termination decision. I didn't read it really as a usable legal rule. I read it as a somewhat clumsily written effect to distinguish between written policy and real policy. For example, a company could have a policy that says you don't fire people for testifying at unemployment hearings, and it could have people with the authority to fire people firing people for testifying at unemployment hearings, so it's clear that the written policy is not real and is not meant to be real. It's meant to be just dressing to protect in legal proceedings. The old legal realist approach to reading decisions to determine what the holding is, is look at the facts and look at the result and figure out what rule would link those facts to that result, and when I read it that way, that's the rule that I get. Judge Kleinfeld, there are some court of appeal decisions after White that did exactly that, which is why I believe the Roby v. McKesson case, which was another wrongful termination case that went to the California Supreme Court, the court said it's not ad hoc decision making. It said it is, quote, formal policies, formal policies. You mean a policy has to be in writing? Or adopted as a formal policy and disseminated throughout the corporation. That's exactly right. Isn't the key, excuse me, one way of looking at this is that there's a difference between making, formulating the policy and having it seep out to the entire corporation in one way or another by example or otherwise, unwritten, and implementing a policy. It seems to me Judge Kleinfeld's question really talks about implementation of a policy can be, can occur though somebody has no effect on making the policy. Judge Carr, all supervisors implement policies. Right. I think it's an important distinction because in a hierarchical organization, the policies are set at the top and they are carried out through successively lower levels of implementation. Maybe the people at the top hope they're carried out at lower levels. Maybe the people at the top hope that they're not and they hope that the written policy will work in a legal proceeding. And if that's the theory, Your Honor, then to get punitive damages as opposed to compensatory damages, it is the burden of the plaintiff to show who at the top had that evil intent. Remember, this is punishment of a corporation, not respondeat superior. California has rejected that as a matter of state law. So that the plaintiff in a punitive damages case has to show that somebody within the control group, you know, the 12 officers of this corporation, the 14 directors of this corporation, or some slightly larger group. So you've got to go for UPS because it's so large, you've got to go back to headquarters in order to have punitive damages awarded in these types of cases. Yes, Your Honor. No matter how egregious the violation, that's what the California courts intended? Your Honor, it's not about the egregiousness of the conduct. It's about the corporate responsibility for it and whether this is a corporate determination. And the White case, again, and Roby both make that point that it's not whether the individual manager did something wrong, but whether the corporation can lawfully be punished for it. And the White case goes extensively through the legislative history of the 3294B amendment, in which the legislature was consciously rejecting the approach that any supervisor could make a company liable for punitive damages. I guess what I keep thinking of is Monell liability. Municipal liability typically for police misconduct is where it comes up. So undoubtedly the police manual and the regulations would say, don't beat up prisoners. But you could have a bad police force where they always beat up prisoners, and anybody that doesn't participate in beating up prisoners gets in trouble because the other police and the supervisors say, something wrong with you here? And he says, but the book says. And they say, yeah, right. And it looks to me like the reason California has developed somewhat hard to understand statements of law is that they're trying to deal with that distinction between the real policy of the police department in my hypothetical case and the formal written policy and say the formal written policy is not the whole deal on policymaking. Your Honor, two answers to that. First, in your hypothetical, the plaintiff to get punitive damages would have to show that somebody at the top knew about and intended the departure from the policy so that the policy was a sham. There's no evidence in this case that the anti-retaliation policy, which is on the books, was ever disregarded by any other supervisor anywhere. So what you would say is limit these deviations from formal policy to sham policies. Well, some evidence that somebody at the top knew that something else was going on. That's exactly right. The second is, in this circumstance, that is where a policy does exist, there's no evidence that it's not routinely followed, it is the plaintiff's burden to show that the person who actually made the decision had some authority over the corporation as a whole aside from the termination decision. Otherwise, in every wrongful termination decision, the managing agent test collapses on itself because the person who makes the decision always has the authority to make the decision. And if anything is clear from the White case, it is that that is not the law. That's what the district court did here. So we know the district court heard. Then we get to what the evidence is. And it's a sufficiency evidence case. And we put them to their challenge. And this is not a mystery. It was in the pretrial order. It was in the discussions. It was in the final argument. We put all the evidence, we attached it to our reply brief. It's 11 pages, five of which are this irrelevant story about Lauren Vicker. So it's six pages that we submit from which no reasonable jury could find. I think the person that I can't remember for sure, I think the person who authorized the dismissal was called the vice president. His title was vice president. Does that make him an officer? No, Your Honor. The officers of UPS are listed in the 10-K, as we point out in our reply brief. It's 12 officers, significantly above the vice president's status. No. I apologize, Judge, go ahead. Oh, go ahead. And, again, that individual had authority for 1.7 percent of the corporation's employees. Is that correct? That's right. He had supervisory authority for the West Los Angeles District, part of Southern California. And I should point out there's an irony in this case. You know, these lawyers at this table have been litigating UPS management cases for a dozen years. They have all the organization charts. They know exactly how this works. They didn't put any of that evidence because they know he's not a manager. That's not in the record. Well, but Marlow's own claim, which is in the record, this court decided his case, is that titles aren't dispositive. He had a supervisor title, and his wage-hour claim was he wasn't really a supervisor. Therefore, he should be paid overtime. So for them now to rest on Robinson's title is a bit ironic, given the nature of this entire litigation, which is that this is a hierarchical organization in which decisions really are made at the top. If I could reserve the balance of my time, Your Honor. Yes, thank you. Thank you. Good morning. May it please the Court. John Furtani from Mr. Marlow. What Mr. Perry omits and what they don't address in their reply brief or in their brief is there was clear testimony from Mr. Robinson about his ranks. Can you keep your voice up a little bit, please? I'm sorry. I think in order to treat him as a policymaking authority, you have to, as a practical matter, impose a duty on the officers and directors of a corporation to constantly investigate their own operation to make sure that their policies are not being ignored or deviated from. Is that right? Actually, that is not the case, Your Honor. What it is in California, there's three standards for punitive damages, and it's in the code and it's in the jury instruction. It was in the special verdict, which is officer, director, or managing agent. How do you find out what they're doing? I mean, the person who's paying the money here is not the guy that fired the employee. It's the widows and orphans that own the UPS stock. So how can they protect themselves from this liability except by constant investigation? The funny thing is here, there was testimony here that they did investigate this. Mr. Robinson testified that before the termination, he spoke with Jerry Mattis, who was the president of the Pacific region of UPS, which in the testimony covered four states. He also testified that he spoke with Mary Sue Allen, who was the HR, the president or the HR manager for the Pacific region. Were any of those people on the 10-K? I don't know if they are, Your Honor. I don't think so. But they don't need to be that on the 10-K. Again, the 10-K is a discretionary document where the SEC requires you only to list certain people. I keep thinking of when Eisenhower got elected and Truman said he's a general. He's going to say do this, do that, and nothing will happen because he wouldn't know what was going on with all the federal employees. And how's UPS? I don't know. It may be as big as the federal government was then, even though it's not as big as the federal government is now. How do they know? Well, they did know because the testimony was that Mr. and Ms. Robinson himself, he had interactions with the Pacific region, which is above him, which talks about exactly what he discussed with them about this investigation. They were well aware. But there's no evidence that anybody else played a role in that decision except for him. Right. He may have talked to somebody else, but is there any evidence? I don't think there's any evidence. And they told him. They endorsed that. They said yes by all means. That's correct. But what they're trying to do is minimize the importance of Mr. Robinson. And the testimony was we asked him to describe the staff-level employees that worked under him. And his testimony was, quote, my staff comprised people that were in charge of operations. They would have been the division managers. They had a specific geographical territory that they were over. The drivers reported to them. Then I had my non-operating staff. Yeah, but, again, I think there's no dispute that he had very substantial authority over a very large area and a large number of employees. But that seems to me to be relative. And at least as I understand the law in this case, not being familiar with California law at all, it is that he had to be in a position where, as a practical matter, whatever his title was, whatever his position was, whatever his duties were, he, in fact, could influence corporate-wide policy. I mean, he may have been, let's say, the son-in-law of the president. And, okay, with little real authority, nominal authority, but he sits down to dinner with his son-in-law, his father-in-law. So, I mean, my point is, as I understand it, it's what could he do and what did he do? What was he expected to do in terms of influencing the overall policies of the corporation? And, candidly, I just don't see in the record where, if that's an accurate perception of the way the law works, that it's there. It's not an accurate perception. Okay. And, in fact, I would refer the court to the Meetry case, which this Ninth Circuit decided on April 1 of 2014, which UPS just recently filed on January 23rd of this year, or January 22nd, which talked about the California courts and how they have viewed corporate employees to be managing agents under Civil Code Section 3294. And they talk about do they have apparent authority that might implicate company-wide policies, not do they set policies. Okay. The other thing is do they approve of decisions contrary to corporate policy, which we clearly have here. And were they treated by other employees as having substantial authority? Every single UPS employee testified. Mr. Robinson was the highest-ranking person in the district. He controlled whether people were promoted. He controlled races. He controlled their decisions. He controlled their entire work lives. There was no debate about this. This strikes me as more of a jury argument than a legal argument. I assure you, he's a really big guy at UPS, and a whole lot of people are under him. But it doesn't show that he makes policy for the corporation. He doesn't have to make policy. What he has to do is his decisions have to implicate policy. Implicate? Implicate? Right. Implicate? Everything implicates policy. That's what the Meetry case says, Your Honor. Everything implicates policy. Right. What do you mean by implicate? It talks about how does it interact? What decisions do you make? How does that affect policy? Anybody who carries out a policy implicates the policy. I think you're using the word. I didn't mean to cut you off. I'm trying to figure out what you mean by implicate. I'm just going off what the Meetry case. Okay. What do you think the case means by implicate? I think what it means is that you look at a person, and you judge by the aggregate of the circumstances here, just as the jury had to, and you say, What authority does he have? What power does he have? How much influence does he have? You go through all the California cases, which the Meetry case also recites, where they have even a supervisor of four employees. They found them to be managing agents. And you say, Are they high enough in the chain to be a managing agent? Which is, I will admit, it is a vague definition as defined in the civil code. It's vague in the various courts. But the court cases in California have upheld that if people at the hierarchy and with the authority can cover such a mass number of employees and of the various departments, Mr. Robinson fits that definition. And more importantly, the jury found that to be by clear and concise. That's just an argument that he's a big guy. Anybody's a policymaker if he supervises a lot of people. No, it's not an argument that he's just a big guy. We went into exactly the different departments that he oversaw. And the question is, again, as the Meetry case looks at, one of the factors you have to evaluate when you decide whether someone's a managing agent is how are they treated by other employees as to whether the other employees treated them as having substantial authority. Well, I'll tell you this. I do agree with what your opposing counsel said in that in some extent this is really a sufficiency of the evidence case. You've got all of these cases out there that talk about situations in which somebody could be deemed a managing agent. And I think we can all agree that the ability to hire and fire just because you're a supervisor and you're a title, none of those things in and of themselves is necessarily dispositive on the question. It's just your level of discretion in making decisions, whether ad hoc or implementing formal decisions. And I think different words, implementing or creating, formulating policy can be used depending on the factual circumstances. But isn't the key that you have that level of substantial discretion in making decisions that could potentially affect corporate policy? You're hitting the exact same thing that Judge Pregerson did in the post-trial motions. And he said, you look at the aggregate. You combine all these factors together. And what Judge Pregerson did is he found on his own in reviewing the judge's JMLO motion that, yes, looking at the evidence and most favorable to the plaintiff. What is there besides this guy being fired that shows that the policy of UPS is to fire people who seek some sort of concerted action for employee benefits? I'm sorry, Your Honor. I didn't understand. This is more than just him. What this was is the evidence showed that he was four months from trial when they fired him. I couldn't hear you. He was four months from trial before they fired him. What is there to show that UPS, as opposed to this guy, has a policy of firing people who litigate against it or organize concerted activity for employee benefits? Besides the other rampant UPS actions, the dockets in the federal courts and the state courts where they're listed against them, where they've been accused of that? I mean evidence that was submitted to the jury in this case. I don't believe we submitted evidence to that, but what we did submit and what the jury found is that there was a class action that was filed by Mr. Marlow. I want to know what evidence there is of a policy by UPS as a corporation to fire people who engage in protected activity. I don't think UPS introduced any policy at all. I didn't ask you about what UPS introduced. I asked you what evidence was there before the jury that UPS had a policy of firing employees who organized concerted activity for benefits. We didn't present it. I don't believe there was any evidence. We focused on it and we were looking at it. So all there is is this is a guy who did that and he's a really big guy at UPS. No, no. What we showed is that it was— The thing about Ultramars, even though it's a little hard to understand their language, they spend most of the pages of the lengthy decision talking about how being a supervisor who fires people isn't enough. Right. And that's why I'm trying to find out what the UPS policy is. Right. And the UPS policy wasn't—I don't believe it was placed into evidence. But what was discussed was that Mr. Robinson had discussions. He was aware that Mr.— Well, you had the burden of proving what UPS policy was. The UPS didn't have the burden of proving what its policy was. No, we don't have to prove what their policy was. Yeah, you do for punitives. It's not enough that there was a wrongful termination. No, what we had to prove is that there was malicious intent, not that there's a policy. What we showed is that—and the aggregate evidence was that they were aware prior to his termination that when the class was decertified, that he had encouraged others to file a lawsuit, that other people had, in fact, followed his lead and filed that lawsuit. I can—I'm sorry, but it seems to me, candidly, so what if UPS had that policy, unwritten, but he understood it as did everybody else in the company at his level? Right. Then all he's doing is implementing the policy. He's not creating it, influencing it. I mean, if the record had shown, for example, he did this and somebody else did it later, the same sort of thing, and the retaliation for some sort of class action suit or whatever, something that a corporation understandably could view as very troublesome and potentially very dangerous and adverse, at some point you could maybe say, yeah, he was the pathfinder. He was the one that showed the way to the other people in the corporation at his level that it was going to be okay. To me, that would be influencing policy. If UPS already had a policy, formal or informal, then all he was doing was, okay, that's our policy. It's not a nice or good one or lawful one, but my point is I understand it. He has to play some kind of affirmative role in the creation, the generation, the establishment of corporate policy. I don't think that's the law here. That's not the law in California. I'm overstating it. And if you would take your hypothetical to the logical end, that means the first person who violates the statutory rights here, they get a free pass, that the corporation gets a free pass to willfully violate some of the statutory rights and retaliate against them for what Judge Ferguson said was an attack upon the integrity of the judicial system. Yeah, they do get a free pass. That's what White v. Ultramar says. It says that if a supervisor with the authority to manage and fire people fires people for a bad reason, that cannot give rise to punitive damages against the corporation because that would be merely vicarious liability for punitive damages, which does not exist in California law. That's what White v. Ultramar says. I disagree with that. Well, I'll read it to you if you really want to get into this. It says a rule defining managing agent as any supervisor who can hire or fire employees but who does not have substantial authority over decisions that ultimately determine corporate policy effectively allows punitive damage liability without proof of anything more than simple tort liability, which we have long recognized is insufficient. I can read you the other passage if you need it that says there's no vicarious liability for punitives. Just to help you review. I apologize. White v. Ultramar was, I believe, a 1999 case. The law has significantly developed since then. What's really tough about your case, I think in some sense, is the sheer size of the corporation involved in this case. You know, I think that in reading through California law, and I struggle to understand where the limits are in terms of managing agents, you can be a local supervisor and still have the ability to exercise the level of discretion that makes you a managing agent because your supervision, although regional, could have some impact on national corporate policy. And so here, Mr. Robinson is a pretty substantial supervisor. Setting aside his title, he manages a lot of people. And in a smaller corporation, I think that that would be enough. Now, how do you think we should look at a situation where somebody is a local supervisor with substantial authority, but yet at the same time, because the corporation is so big, he's still relatively small in the broader scheme of things. How do we look at that, and what cases do you think we should look to for the answer to that question? I think we should look at it the same way Judge Pregerson did in the post-trial motions, where Judge Pregerson did address this issue. And his position was you cannot just go back to Atlanta and say the people, whatever the number of board of directors are, have to authorize this action. If you're doing that, you're making a mockery of California law. You're making a mockery of punitive damages here. If you're doing that, you're giving a free pass to every large corporation because, again, there's certain issues that you have to hold people accountable for. We don't really make California policy. The California Supreme Court decides what California law is. But this court does affect the law here. We're just struggling to interpret it. We're struggling to apply whatever the California courts say about it. But when you look at the analogous cases where the managing agent has been found, this case clearly falls within the managing agent definition. What they're asking you to do is to impose a bright-line formula here. California has already rejected the bright-line formula. And you take it on a case-by-case basis. And you take it by the aggregate of the facts, just as Judge Pregerson did in the post-trial motions. We've taken you actually over your time, so let me see if Judge Parr has any questions. I'd like to ask about another issue, if I may. And that is let's assume we agree with you, okay? But that's only part of this case. What about the challenge to the damage award as it now stands? What, $6.6 million? It is. Judge Pregerson imposed a 3-to-1 ratio. He reduced it from a 7.22 ratio. And remember, the goal in punitive damages is to find a threshold upon which you cannot go as high as. It's not to find the perfect number. But Judge Pregerson, in issuing the remittitor, he addressed exactly why. And the most important factor was the reprehensibility. And, again, Judge Pregerson is a very experienced district judge. He sat here as a guest justice on this court. And what he said is he's seen nothing more reprehensible than UPS's actions in this case. That's significant when you have a trial judge of 20-plus years who reaches that conclusion. I have. Okay. Thank you. All right. Judge Kleinfeld, do you have any additional questions? All right. Thank you very much for your argument. My friend referred to Judge Pregerson's post-trial decision, which said, and this is a page of year 19, you're looking to see what person in the management hierarchy would have significant managerial authority over the decision whether to terminate somebody. That violates the very principle of white, the holding of white. The law has not changed in a way that my friend suggests. This court is bound, of course, to follow California law. The Roby case, a recent decision from the California Supreme Court that he won't address, said, quote, when we spoke in white about persons having discretionary authority over corporate policy, we were referring to formal policies that affect a substantial portion of the company and are likely to come to the attention of corporate leadership. It is this sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice. What this case is about is an isolated act, no broad policy. Judge Carr, finally, on punitive damages, I would point to the comparability ratio, one-point labor code section 98.6, the statutory basis for their claim, says you cannot fire somebody for engaging in protected activity, specifically filing a wage-hour lawsuit. It sets the maximum penalty at $10,000, over and above compensation. This award, $6.6 million, is grossly unconstitutionally disproportionate to that, as well as all the other factors in our brief. All right. Thank you very much. Interesting issues and an interesting case. We'll submit this matter for decision by the court, and let's take a brief break.
judges: Carr, Kleinfeld, Nguyen